Andrew Wachtenheim (Bar No. 4916813)
Immigrant Defense Project
40 West 39th Street, Fifth Floor
New York, NY 10018
T: (646) 760-0588
andrew@immdefense.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JESUS PRADO, a.k.a. ANTONIO VANEGAS, <br><br> Plaintiff, <br><br> v. <br><br> ICE AGENT PEREZ, ICE AGENT ATTANASIO, ICE AGENT OLIVENCIA, ICE AGENT CALIDONIO, and UNITED STATES OF AMERICA, <br><br> Defendants. | **COMPLAINT** <br> JURY TRIAL DEMANDED |

Plaintiff Jesus Prado, a.k.a. Antonio Vanegas, by and through counsel, alleges the following:

### INTRODUCTION

1.      Plaintiff Jesus Prado brings this action to redress the unconstitutional and tortious mistreatment he suffered as a civil immigration detainee. Mr. Prado has long lived with severe and debilitating illnesses, both mental and physical: HIV, major neurocognitive impairment, depression, and anxiety. Because he requires a high level of daily care, he lives in a supportive housing environment. In late 2015, he was receiving psychiatric treatment through the Manhattan Mental Health Court, a program for severely mentally ill individuals.

2.      On October 27, 2015, Mr. Prado was arrested inside his home by agents of U.S. Immigration and Customs Enforcement (ICE). Although they knew, or should have known, about Mr. Prado's disabilities, the agents conducted an early-morning raid, forcing their way into

Mr. Prado's apartment and searching it without his consent or a judicial warrant. These actions violated the Fourth Amendment and breached a duty of care toward Mr. Prado, traumatizing him and inflicting needless psychological harm.

3.      ICE continued to neglect Mr. Prado during the nearly five months he was held in civil immigration detention in New Jersey. ICE first breached its duty to ensure Mr. Prado received his necessary prescription medications, causing a lapse in treatment of several days that left him suicidal, nauseated, and debilitated. Without his medications, a manageable prostate condition worsened to the point that Mr. Prado required a catheter. As a result, he experienced humiliation, difficulty sitting down or urinating, and near-constant excruciating pain.

4.      Mr. Prado required a surgical procedure to relieve his prostate condition. Yet despite repeated requests from his pro bono counsel to the New York Field Office, ICE failed to schedule the surgery for almost two months, prolonging his pain and distress. Mr. Prado was released from ICE custody on his own recognizance by an immigration judge on April 19, 2016.

5.      He brings this action under the Federal Tort Claims Act for trespass, abuse of process, negligent infliction of emotional distress, and negligence; and under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for violation of his Fourth Amendment protection against unreasonable search and seizure. Mr. Prado seeks compensatory damages against ICE for the tortious acts and omissions of its employees and officials. He seeks compensatory and punitive damages against ICE Agents Perez, Attanasio, Olivencia, and Calidonio for violating his constitutional rights.

## **PARTIES**

6.      Plaintiff Jesus Prado is a resident of New York State who has been living at 621 Water Street, Apt. 312, New York, NY 10002, since May 6, 2013. ICE agents arrested him at his

residence on October 27, 2015, and detained him at the Bergen County Jail in Hackensack, NJ until April 19, 2016, when an immigration judge ordered Mr. Prado's release from custody on his own recognizance and he returned to his residence.

7.      Defendants Agent Perez, Agent Attanasio, Agent Olivencia, and Agent Calidonio are officers of U.S. Immigration and Customs Enforcement. At all times relevant to the events at issue in this case, these Defendants were acting under color of authority of the U.S. Department of Homeland Security (DHS). On information and belief, these Defendants were at Mr. Prado's apartment and personally committed the violations against Mr. Prado. They are sued in their individual capacities.

8.      Defendant United States of America is sued under the Federal Tort Claims Act for the tortious acts and omissions of its employees, including employees of U.S. Immigration and Customs Enforcement, a federal law enforcement agency operating under the U.S. Department of Homeland Security. ICE's Office of Enforcement and Removal Operations (ERO) houses civil immigration detainees at the Bergen County Jail, pursuant to an Intergovernmental Agreement between Defendant United States and Bergen County, NJ, under the oversight of the ERO Field Office Director in New York. ICE ERO is also responsible for immigration-related surveillance, apprehension, and arrest operations in the interior of the United States.

## JURISDICTION AND VENUE

9.      Mr. Prado's claim against the United States is brought under the FTCA and *Bivens* to redress injury caused by constitutional violations and tortious acts and omissions committed by officials and employees of ICE acting within the scope of their employment.

10.      On October 24, 2017, Mr. Prado exhausted his administrative remedies by timely serving an Administrative Claim (Form 95) on DHS and on ICE.

11.     On June 14, 2018, DHS and ICE denied Mr. Prado's claim, thus providing for Mr. Prado to file suit in an appropriate United States District Court within six months.

12.     This Court has jurisdiction under 28 U.S.C. § 1331, which provides for jurisdiction in the United States district courts of civil actions arising under the Constitution, laws, or treaties of the United States; and 28 U.S.C. § 1346(b), which provides for jurisdiction in the United States district courts of civil actions brought under the Federal Tort Claims Act.

13.     Venue is proper under 28 U.S.C. §§ 1391(b) and 1402(b) because Plaintiff resides in the Southern District of New York, and because a substantial portion of the events giving rise to the claims in this Complaint occurred in this district.

## FACTS

**Mr. Prado's Physical and Mental Health**

14.     Mr. Prado is a 60-year-old immigrant of Latin American descent. He has lived with HIV since testing positive in 1994. Since that time, Mr. Prado has coped with his depleted immune system. Additionally, he suffers from multiple associated ongoing medical and mental health issues, including major neurocognitive disorder and debilitating depression. In 2011, he was diagnosed with acute cerebral toxoplasmosis. He experiences difficulty thinking clearly, sustaining his attention, and remembering. Because of these problems, Mr. Prado requires a consistent and high level of care and is unable to independently perform the activities of daily living.

15.     Since 2009, he has received supportive housing through New York City's HIV/AIDS Services Administration. On May 6, 2013, he began living at his current residence, a Community Access housing complex at Gouverneur Court. The facility primarily serves tenants with psychiatric disabilities and HIV/AIDS, as well as low-income individuals.

16.     At Gouverneur Court, on-site staff provide Mr. Prado with supportive services, daily meals, and regular in-home visits. The facility has a 24-hour security desk, which notifies residents whenever they have visitors.

17.     Mr. Prado has been treated by the same physician in New York City for approximately twelve years.

18.     At the time Defendants arrested Mr. Prado in 2015, he was required to adhere to a complicated medical regimen, including daily medications for HIV, opportunistic infections, depression, anxiety, gastric reflux, and prostate-related obstructive uropathy. Without his access and commitment to these medications, Mr. Prado would be unlikely to survive for any significant length of time.

19.     At the time Defendants arrested Mr. Prado in 2015, he was receiving outpatient psychiatric treatment through Mental Health Court in New York City by agreement of the New York County District Attorney. To be eligible for participation in the Mental Health Court, an individual must be diagnosed with a serious mental illness such as bipolar disorder, major depression, or schizophrenia. For over a year, Mr. Prado had participated in full compliance with the requirements of the program, including outpatient psychiatric treatments and regular meetings with a judge. At the time of his arrest by ICE, he was about to move into the final phase of his program.

**ICE Agents Raid Mr. Prado's Apartment**

20.     At around 5:00 a.m. on October 27, 2015, ICE Agents Perez, Attanasio, Olivencia, and Calidonio entered the Gouverneur Court housing complex. The agents possessed an administrative arrest warrant for Antonio Vanegas. On information and belief, the agents did

not possess or present a judicial warrant issued by an Article III judge or any other neutral magistrate.

21.    An administrative immigration warrant (Form I-200) is not issued by a court and does not require approval from a neutral magistrate to be executed. It may be issued by any supervisory official with delegated authority to do so. 8 C.F.R. § 287.5(e)(2). An I-200 authorizes an immigration officer to effectuate an arrest, but it does not permit entry into or search of a constitutionally protected location in the absence of consent or exigent circumstances. Upon information and belief, ICE officers are instructed to obtain informed consent before entering or searching any nonpublic area.

22.    The Defendants, therefore, lacked authorization to enter and search Mr. Prado's apartment without voluntary consent or exigent circumstances.

23.    Upon information and belief, the agents used the administrative warrant to gain access to the Gouverneur Court facility and Mr. Prado's apartment.

24.    It is customary for tenants at Gouverneur Court to receive advance notification when they have visitors. However, Mr. Prado was not notified that ICE agents had entered the building or were coming to his apartment.

25.    Mr. Prado was awakened by a loud noise at his apartment door. He heard a voice yelling, "Police! Open the door!" Mr. Prado got out of bed and opened the apartment door. As soon as he did so, the agents pushed him back into the room. One of the agents said that they were "immigration" and ordered him to move to the bed.

26.    At no time did the ICE agents request, nor did Mr. Prado give, voluntary consent to enter his apartment.

27.     An agent grabbed Mr. Prado by his shirt and pushed him onto the bed, where he began to cry. Mr. Prado asked what was happening and said he had not done anything. The agent demanded ID and "papers" and warned Mr. Prado not to talk. Mr. Prado said that he had paperwork showing he was "PRUCOL" (Permanently Residing Under Color of Law), but the agent responded that he did not care. Three agents were in the apartment, while one stood in the doorway with his hand on his gun.

28.     The agents began searching through Mr. Prado's drawers, cabinets, and closet, again without asking or receiving permission. Mr. Prado, who was confined to his bed at this point and posed no danger, said that the agents needed a warrant to search his apartment, to which they responded that it was their job.

29.     Eventually, the agents told Mr. Prado to put on some clothes because they were taking him into ICE custody. Mr. Prado said that he was sick and had HIV and that he needed to bring his medications along. The agents picked up Mr. Prado's bag of prescription medications, but did not inquire into his medical condition. They then handcuffed him and took him to their car.

30.     Throughout this encounter, Mr. Prado experienced psychological trauma and physical discomfort as a result of the ICE agents' intrusion.

31.     The agents transported Mr. Prado to 26 Federal Plaza, New York, NY for processing, and from there to the Varick Street Federal Building in Manhattan, where he received an initial medical screening and was issued a Notice to Appear in Removal Proceedings. Later in the morning, Mr. Prado was transported to the Bergen County Jail in Hackensack, NJ.

**Mr. Prado Is Denied Necessary Medications and Surgery in Bergen County Jail**

32.     Mr. Prado was detained at Bergen County Jail pursuant to 8 U.S.C. § 1226 between October 27, 2015, and April 19, 2016. Since November 9, 2015, he has been represented by pro bono counsel at The Legal Aid Society.

33.     Bergen County Jail is operated by the Office of the Bergen County Sheriff. It houses immigration detainees pursuant to a United States Marshals Service Intergovernmental Agreement (IGA), under the direct oversight of ICE's New York Field Office (copy attached as Exhibit A). Although ICE contracts with various government entities to share responsibility for the day-to-day care provided to detainees, ICE remains responsible for "ensur[ing] its facilities follow ICE's National Detention Standards." Immigration and Customs Enforcement, *Detention Management*, *available at* http://www.ice.gov/detention-management (last visited Oct. 23, 2018). At the time Mr. Prado was detained, ICE was responsible for ensuring Bergen County Jail's compliance with the ICE National Detention Standards (NDS).

34.     As a contract detention facility, Bergen County Jail must provide immigration detainees with safekeeping, housing, subsistence, and medical care consistent with state and federal law and the NDS. ICE is responsible for ensuring that these services are provided appropriately and adequately. Upon information and belief, ICE employees from the New York Field Office, including Deportation Officers and Field Medical Coordinators, are regularly onsite at Bergen County Jail.

35.     The current NDS require that all immigration detainees receive an initial medical and mental health screening, after which detainees with identified medical concerns receive follow-up evaluation and treatment. *See* Immigration and Customs Enforcement, *2011 Performance-Based National Detention Standards* 266-68, *available at*

https://www.ice.gov/detention-standards/2011 (last visited Oct. 23, 2018). In particular, for detainees with "serious physical or mental illness" (including HIV and neurocognitive disorder), the ICE Field Office Director must be notified "as soon as practicable." *Id.* at 274-75. Upon information and belief, ICE detainees receive an initial screening at the Varick Street facility before they are transferred to Bergen County Jail.

36.     The NDS also require ICE to administer prescription medication "on schedule and without interruption, absent exigent circumstances" *Id.* at 273. When detainees are transferred to another facility after receiving an initial screening, the sending facility must send a medical summary that includes prescription information "with instructions for dose, frequency, etc.," *id.* at 459, as well as a 7-day supply of medications, *id.* at 276. The IGA with Bergen County Jail also states that "[m]edical records must travel with the federal detainee." Exh. A at 5.

37.     At one of the ICE processing locations in Manhattan, Mr. Prado's prescription medication bag was taken from him and thrown in the trash. An ICE employee told him that he would be provided medications in New Jersey.

38.     Mr. Prado did not receive any medications for five days after his arrival at Bergen County Jail, despite being screened at the Varick Street facility. After he arrived at the jail, Mr. Prado asked a guard if he could speak with a doctor because he had HIV and was not receiving his medication. That guard shared Mr. Prado's HIV-positive status with other guards and other inmates. Eventually, Mr. Prado was able to meet with medical staff at the jail clinic, where he was asked what medications he took but could not remember the correct names. After this appointment, the jail administered the incorrect medications, causing Mr. Prado to experience nausea and diarrhea. Only after Mr. Prado's physician contacted ICE did the jail clinic administer the correct prescriptions, eight days after he was first detained.

39.     Because he was deprived of his necessary medications for several days, Mr. Prado felt physically weak, fatigued, and lost his appetite. He felt as though he was going to die without his medications and feared he might kill himself.

40.     By failing to ensure that Mr. Prado would receive his prescribed medications upon arrival at Bergen County Jail, ICE violated the NDS and breached its duty to provide continuity of care.

41.     Even after Bergen County Jail began providing the correct medications to Mr. Prado, they were improperly administered. Because of the large number of medications, Mr. Prado was required to take them on a staggered basis—some in the morning, the others in the afternoon and evening. The medications also needed to be administered with food or milk to alleviate the impact on Mr. Prado's system.

42.     However, medical staff administered all of Mr. Prado's medications at one time, in the morning, and did not provide any food or milk along with the medications. This caused Mr. Prado to become sick to his stomach and experience daily vomiting and diarrhea.

43.     Mr. Prado's pro bono counsel, Sarah Gillman, first emailed the ICE New York Field Office on November 9, 2015, to request that his medications be administered correctly. On November 12, she was informed that the doctor at Bergen County Jail had changed Mr. Prado's medications and split the times of dispensation. However, the jail continued to administer the medications without milk or food for nearly three months, causing extreme stomach pain, even after Mr. Prado's counsel sent follow-up emails on January 7 and 27, 2016.

44.     At the time he was detained, Mr. Prado also took medication for prostate-related obstructive uropathy (difficulty urinating caused by an enlarged prostate). Because ICE did not provide him with this medication for several days after being detained, his condition worsened.

Mr. Prado experienced excruciating pain and a swollen bladder as a result of his inability to urinate. This condition persisted for months.

45.     In late December 2015, medical staff at Bergen County Jail examined Mr. Prado and provided him with a catheter and adult diapers. The catheter caused even more pain than before and contributed to Mr. Prado's trauma and emotional distress. It left him unable to sit or walk without difficulty.

46.     The week of January 11, 2016, Mr. Prado met with a urologist, who informed him that his prostate was no longer treatable with medication and that a surgical procedure, transurethral resection of the prostate (TURP), was necessary.

47.     Mr. Prado did not receive the TURP procedure until March 9, 2016, nearly two months later. He was not given an explanation for the delay in treatment.

48.     Mr. Prado's counsel contacted the ICE New York Field Office numerous times during this period seeking assistance. On January 27, 2016, she wrote to Mr. Prado's Deportation Officers to request a second specialist evaluation due to Mr. Prado's ongoing pain and visibly poor health. On February 2, 2016, she submitted a request for Mr. Prado to be returned to the Community Access supportive housing facility at Gouverneur Court, where he would receive comprehensive care. The request included a letter from an outside physician detailing the complexity of Mr. Prado's healthcare needs and his precarious state.

49.     On February 4, 2016, Mr. Prado's counsel emailed William Joyce, Assistant Field Office Director for the New York Field Office, requesting an update. Mr. Joyce responded that according to the Field Medical Coordinator, Mr. Prado was "being well managed medically" and was "mentally stable." Mr. Joyce suggested that should Mr. Prado need additional medical care, he would be transferred to another ICE detention center, such as Batavia, near Buffalo, NY, or

Krome, near Miami, FL. Throughout this period, and currently, Mr. Prado was in ongoing removal proceedings before the Immigration Court in New York City, and has been represented by local pro bono counsel. Any change in location during Mr. Prado's detention would have been disruptive to his mental health.

50.     Contrary to Mr. Joyce's response, Mr. Prado was still experiencing pain and discomfort from the catheter—which became infected due to the conditions at the jail—as well as psychological trauma and depression, as his counsel observed during visits on February 6 and 8, 2016.

51.     On March 1, 2016, ICE denied Mr. Prado's request to be released from Bergen County Jail. On March 8, 2016, Mr. Prado was transported to the Bergen Regional Medical Center for the TURP procedure. Mr. Prado was immobilized for a week after the TURP procedure and required physical therapy to resume walking normally.

52.     According to the IGA with Bergen County Jail, the United States is financially responsible for all medical care provided to federal detainees outside the jail, and must pre-approve all non-emergency outside care. *See* Exh. A at 4. Defendant therefore assumed a duty to ensure that immigration detainees received necessary external treatment in a timely manner.

53.     ICE breached this duty by delaying Mr. Prado's necessary outside procedure for nearly two months without explanation.

54.     On April 19, 2016, Immigration Judge Thomas Mulligan ordered Mr. Prado's release from ICE custody on his own recognizance and return to his supportive housing at Gouverneur Court.

**Mr. Prado's Damages**

55.     Mr. Prado suffered acute and ongoing emotional distress as a result of the individual Defendants' early-morning intrusion into his apartment. He continues to experience difficulty sleeping and a fear of loud noises. He suffers from nervousness and anxiety while at home and routinely places large objects behind his door, fearing another intrusion. He is unable to leave his apartment after certain hours of the night, and cries when he remembers his arrest.

56.     Because Defendant failed to ensure that Mr. Prado's prescription medications were administered properly while he was under Defendant's custody and control, he experienced severe physical and mental symptoms lasting for several months.

57.     Mr. Prado suffered prolonged, extreme pain and mental anguish as a result of Defendant's failure to timely schedule a medically necessary prostate surgery while he was under Defendant's custody and control.

## CLAIMS

### First Claim
### Fourth Amendment Claim for Damages Under *Bivens*
### Unlawful Entry and Unreasonable Search and Seizure

58.     Mr. Prado incorporates and re-alleges the foregoing allegations as if fully set forth herein.

59.     Defendants Perez, Attanasio, Olivencia, and Calidonio violated Mr. Prado's Fourth Amendment right to be free from unreasonable searches and seizures when they entered his residence without a judicial warrant or voluntary consent, and without the presence of any exigent circumstances.

60.     Defendants Perez, Attanasio, Olivencia, and Calidonio violated Mr. Prado's Fourth Amendment right to be free from unreasonable searches and seizures when they searched

his apartment and detained him without a judicial warrant, exigency, or probable cause that he had committed a crime.

61.    As a result of the unjustified and unconstitutional conduct of Defendants Perez, Attanasio. Olivencia, and Calidonio, Mr. Prado suffered damages, including but not limited to actual damages, loss of liberty, humiliation, fear, and severe and lasting emotional distress.

**Second Claim**
**Federal Tort Claims Act – 28 U.S.C. § 1346(b)**
**Trespass**

62.    Mr. Prado incorporates and re-alleges the foregoing allegations as if fully set forth herein.

63.    Under New York law, trespass requires (1) interference with a person's right to possession of real property (2) either by an unlawful act or a lawful act performed in an unlawful manner.

64.     Defendant's employees knowingly and intentionally interfered with Mr. Prado's right to possession when they entered and searched his apartment without his consent.

65.    The ICE agents' actions were unprivileged and unlawful because they lacked a valid judicial warrant.

66.    Mr. Prado suffered damages, including but not limited to severe and ongoing anxiety, fear, and psychological trauma, as a direct consequence of the intrusion.

67.    The actions of Defendant's employees constitute trespass under New York law.

**Third Claim**
**Federal Tort Claims Act – 28 U.S.C. § 1346(b)**
**Abuse of Process**

68.    Mr. Prado incorporates and re-alleges the foregoing allegations as if fully set forth herein.

14

69.     Under New York law, abuse of process requires (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective.

70.     Defendant's employees abused legal process by exceeding the scope of the administrative arrest warrant, Form I-200, which did not authorize entry into or searches of constitutionally protected areas absent consent.

71.     The ICE agents intentionally used the I-200 warrant for the improper purpose of unlawfully gaining access to the Gouverneur Court supportive housing facility and Mr. Prado's apartment.

72.     Mr. Prado suffered damages as a result of the ICE agents' unjustified abuse of their legal authority.

73.     The actions of Defendant's employees constitute abuse of process under New York law.

### Fourth Claim
### Federal Tort Claims Act – 28 U.S.C. § 1346(b)
### Negligent Infliction of Emotional Distress

74.     Mr. Prado incorporates and re-alleges the foregoing allegations as if fully set forth herein.

75.     Under New York law, negligent infliction of emotional distress requires a breach of a duty of care that results directly in emotional harm.

76.     Defendant's officials and employees knew, or should have known, that the Community Access supportive housing facility at Gouverneur Court served a vulnerable tenant population with disabilities, including HIV and severe psychiatric illness.

77.     Defendant's officials and employees also knew, or should have known, that Mr. Prado was a participant in the Manhattan Mental Health Court, and thus had a diagnosed serious mental illness.

78.     From the moment Mr. Prado opened his apartment door to the four ICE agents, his freedom to act on his own behalf was involuntarily restrained. Because Mr. Prado was therefore in their custody, the agents assumed a duty of reasonable care toward him.

79.     Because Defendant's officials and employees knew, or should have known, about Mr. Prado's mental and physical disability, they had a duty to take reasonable measures to avoid inflicting unnecessary harm on him. The ICE agents breached this duty by entering Mr. Prado's apartment at an early hour, without advance notice, and without Mr. Prado's consent, and by confining him as they effected an unconstitutional search.

80.     Defendants' officials and employees disregarded mandatory and non-discretionary obligations under the United States Constitution and agency policies.

81.     As a direct result of these actions, Mr. Prado suffered emotional distress, including fear, humiliation, anxiety, and psychological trauma. These effects persisted well after Mr. Prado's release from ICE custody.

82.     The actions of Defendant's officials and employees constitute negligent infliction of emotional distress under New York law.

**Fifth Claim**
**Federal Tort Claims Act – 28 U.S.C. § 1346(b)**
**Negligence**

83.     Mr. Prado incorporates and re-alleges the foregoing allegations as if fully set forth herein.

16

84.     By arresting Mr. Prado and placing him in civil immigration detention, Defendant and its officials and employees assumed a nondiscretionary duty to care for Mr. Prado's health and to provide adequate medical care.

85.     ICE's detention standards require that all detainees receive an initial medical screening, that medical records and prescription medications travel with detainees between facilities, and that prescription medications are administered properly. Defendant and its employees have no discretion to disregard these requirements.

86.     Defendant and its officials and employees failed to provide or cause others to provide Mr. Prado with his necessary medications upon transfer to Bergen County Jail. ICE agents discarded Mr. Prado's bag of medications after his arrest, and failed to obtain and send his prescription information to the Bergen County Jail. Defendant and its employees thus violated ICE's detention standards and breached their duty of care to Mr. Prado.

87.     Defendant's failure to provide or to cause others to provide Mr. Prado with his prescribed medications substantially created an unreasonable risk to Mr. Prado's physical and mental health while he was detained at Bergen County Jail. For five days, he received no medications, and for several weeks thereafter his medications were not administered in accordance with the specific instructions and procedures of his health care provider. As a result, he suffered damages, including but not limited to weakness, depression, psychological trauma, nausea, and incontinence.

88.     Pursuant to its IGA with Bergen County Jail, Defendant and its officials and employees are responsible for approving, supervising, and ensuring timely provision of external medical care to detainees. This duty is both nondelegated and nondiscretionary.

17

89.     ICE officials and employees knew, or should have known, that Mr. Prado required surgical treatment for his prostate-related obstructive uropathy, and that delay in arranging the TURP procedure prolonged Mr. Prado's extreme pain and mental anguish. ICE officials and employees disregarded numerous communications from Mr. Prado's pro bono counsel alerting them to his deteriorating condition.

90.     By failing to approve and arrange, or cause others to arrange, the necessary TURP procedure for Mr. Prado in a timely manner, Defendant and its officials and employees breached their duty to provide and ensure reasonable and timely medical care to civil immigration detainees.

91.     Defendant's failure to ensure Mr. Prado received a medically necessary surgery in a timely manner created an unreasonable risk to Mr. Prado's health and caused direct injury. For several weeks, as a result of this breach of duty of care, he was in excruciating physical pain and was unable to sit, walk, or urinate without great difficulty.

92.     The actions of Defendant's officials and employees constitute negligence under New York law.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff Jesus Prado respectfully requests that this Court:

(1) Declare that the policies, practices, and conduct described in this Complaint are in violation of the rights of Mr. Prado under the Fourth Amendment to the United States Constitution.

(2) Award Mr. Prado compensatory and punitive damages in amounts to be proven at trial.

(3) Award Mr. Prado reasonable attorneys' fees.

(4) Grant such other relief as this Court deems just and equitable.

Respectfully submitted,

/s/ Andrew Wachtenheim
Andrew Wachtenheim (Bar No. 4916813)
Immigrant Defense Project
40 West 39th Street, Fifth Floor
New York, NY 10018
Telephone: (646) 760-0588
E-mail: andrew@immdefense.org
*Counsel for Plaintiff*

Dated: October 24, 2018

# EXHIBIT A

| 1. Agreement Number 50-06-0023 | 2. Effective Date See Block 19. | 3. Facility Code(s) 2EM & 2AB | 4. DUNS Number 076687284 |
|---|---|---|---|
| 5. Issuing Federal Agency United States Marshals Service Prisoner Operations Division Office of Interagency Agreements Washington, DC 20530-1000 | | 6. Local Government Bergen County Annex & Jail 160 South River Street Hackensack, NJ 07601 Tax ID#: 22-6002426 | |
| 7. Appropriation Data 15X1020 | | 8. Local Contact Person Allen Ust | |
| | | 9. Tel: 2015273003 Fax: 201-5273035 Email: aust@bcsd.us | |
| 10. This agreement is for the housing, safekeeping, and subsistence of federal prisoners, in accordance with content set forth herein. | | 11. Male: 133   Female: 13 (Estimated Federal Beds) | 12. $110.00 |
| 13. Optional Guard/Transportation Services: ☒ Medical Services ☒ U.S. Courthouse | | 14. Guard Hour Rate: $29.00 Mileage shall be reimbursed by the Federal Government at the GSA Federal Travel Regulation Mileage Rate. | |
| 15. Local Government Certification To the best of my knowledge and belief, information submitted in support of this agreement is true and correct, this document has been duly authorized by the governing of the Department or Agency and the Department or Agency will comply with all provisions set forth herein. | | 16. Signature of Person Authorized to Sign (Local) Signature Leo McGuire Name Sheriff    3/7/09 Title        Date | |
| 17.Prisoner and Detainee Type Authorized ☒ Adult Male ☒ Adult Female ☐ Juvenile Male ☐ Juvenile Female ☒ ICE Detainees | 18. Other Authorized Agency User ☐ BOP ☒ ICE | 19. Signature of Person Authorized to Sign (Federal) Signature Renita L. Barbee Name Senior Grants Specialist    MAR 2 3 2009 Title        Date | |

Page 1 of 12

Agreement Number 50-06-0023

Authority ................................................................................. 3
Purpose of Agreement and Security Provided .................................. 3
Period of Performance ................................................................ 3
Assignment and Outsourcing of Jail Operations ............................... 4
Medical Services ....................................................................... 4
Receiving and Discharge of Federal Detainees ................................ 6
Optional Guard/Transportation Services to Medical Facility............... 6
Optional Guard/Transportation Services to U.S. Courthouse............. 7
Special Notifications.................................................................... 7
Prisoner Rape Elimination Act (PREA) ........................................... 8
Service Contract Act .................................................................. 8
Per-Diem Rate .......................................................................... 8
Billing and Financial Provisions .................................................... 9
Payment Procedures ..................................................................10
Modifications and Disputes...........................................................10
Inspection of Services ................................................................10
Litigation .................................................................................10
Prisoner Rape Elimination Act Reporting Information.......................12

JUNE 2015 ICE2012FOIA03030.000018

Agreement Number 50-06-0023

## Authority

Pursuant to the authority of Section 119 of the Department of Justice Appropriations Acts of 2001 (Public Law 106-553), this Agreement is entered into between the United States Marshals Service (hereinafter referred to as the "Federal Government") and the Bergen County Jail (hereinafter referred to as "Local Government"), who hereby agree as follows:

## Purpose of Agreement and Security Provided

The Federal Government and the Local Government establish this Agreement that allows the United States Marshals Service (USMS) to house federal detainees with the Local Government at the Bergen County Jail 160 South River Street Hackensack, NJ 07601 (hereinafter referred to as "the facility").

The population, hereinafter referred to as "federal detainees," will include individuals charged with federal offenses and detained while awaiting trial, individuals who have been sentenced and are awaiting designation and transport to a BOP facility, and individuals who are awaiting a hearing on their immigration status or deportation.

The Local Government shall accept and provide for the secure custody, safekeeping, housing, subsistence and care of federal detainees in accordance with all state and local laws, standards, regulations, policies and court orders applicable to the operation of the facility. Detainees shall also be housed in a manner that is consistent with federal law and the Federal Performance-based Detention Standards.

The USMS ensures the secure custody, care, and safekeeping of USMS detainees. Accordingly, all housing or work assignments, and recreation or other activities for USMS detainees are permitted only within secure areas of the building or within the secure external recreational/exercise areas.

At all times, the Federal Government shall have access to the facility and to the federal detainees housed there, and to all records pertaining to this Agreement, including financial records, for a period going back 3 years from the date of request by the Federal Government.

## Period of Performance

This Agreement is effective upon the date of signature of both parties, and remains in effect unless terminated by either party with written notice. The Local Government shall provide no less than 120 calendar

JUNE 2015 ICE2012FOIA03030.000019

Case 1:18-cv-09806  Document 1  Filed 10/24/18  Page 24 of 32

days notice of their intent to terminate.  Where the Local Government has received a Cooperative Agreement Program (CAP) award, the termination provisions of the CAP prevail.

## Assignment and Outsourcing of Jail Operations

Overall management and operation of the facility housing federal detainees may not be contracted out without the prior express written consent of the Federal Government.

## Medical Services

The Local Government shall provide federal detainees with the full range of medical care inside the detention facility.  The level of care inside the facility should be the same as that provided to state and local detainees.  The Local Government is financially responsible for all medical care provided inside the facility to federal detainees.  This includes the cost of all medical, dental, and mental health care as well as the cost of medical supplies, over the counter prescriptions and, any prescription medications routinely stocked by the facility which are provided to federal detainees.  The cost of all of the above referenced medical care is covered by the federal per diem rate.  However, if dialysis is provided within the facility, the Federal Government will pay for the cost of that service.

The Federal Government is financially responsible for all medical care provided outside the facility to federal detainees.  The Federal Government must be billed directly by the medical care provider not the Local Government.  In order to ensure that Medicare rates are properly applied, medical claims for federal detainees must be on Centers for Medicare and Medicaid (CMS) Forms in order to be re-priced at Medicare rates in accordance with Title 18, USC Section 4006.  The Local Government is required to immediately forward all medical claims for federal detainees to the Federal Government for processing.

All outside medical care provided to federal detainees must be pre-approved by the Federal Government.  In the event of an emergency, the Local Government shall proceed immediately with necessary medical treatment.  In such an event, the Local Government shall notify the Federal Government immediately regarding the nature of the federal detainee's illness or injury as well as the types of treatment provided.

JUNE 2015 ICE2012FOIA03030.000020

Agreement Number 50-06-0023

Medical care for federal detainees shall be provided by the Local Government in accordance with the provisions of USMS, Publication 100-Prisoner Health Care Standards (www.usmarshals.gov/prisoner/standards.htm) and in compliance with USMS Inspection Guidelines, USM 218 Detention Facility Investigative Report. The Local Government is responsible for all associated medical record keeping.

The facility shall have in place an adequate infectious disease control program which includes testing of all federal detainees for Tuberculosis (TB) as soon as possible after intake (not to exceed 14 days). When Purified Protein Derivative (PPD) skin tests are utilized, they shall be read between 48 and 72 hours after placement.

TB testing shall be accomplished in accordance with the latest Centers for Disease Control (CDC) Guidelines and the result promptly documented in the federal detainee's medical record. Special requests for expedited TB testing and clearance (to include time sensitive moves) will be accomplished through advance coordination by the Federal Government and Local Government.

The Local Government shall immediately notify the Federal Government of any cases of suspected or active TB or any other highly communicable disease such as Severe Acute Respiratory Syndrome (SARS), Avian Flu, Methicillin-resistant Staphylococcus Aureus (MRSA), Chicken Pox, etc., which might affect scheduled transports or productions so that protective measures can be taken by the Federal Government.

When a federal detainee is being transferred and/or released from the facility, they will be provided with seven days of prescription medication which will be dispensed from the facility. When possible, generic medications should be prescribed. Medical records must travel with the federal detainee. If the records are maintained at a medical contractor's facility, it is the Local Government's responsibility to obtain them before a federal detainee is moved.

Federal detainees may be charged a medical co-payment by the Local Government in accordance with the provisions of Title 18, USC Section 4013(d). The Federal Government is not responsible for medical co-payments and cannot be billed for these costs even for indigent federal prisoners.

JUNE 2015 ICE2012FOIA03030.000021

**Receiving and Discharge of Federal Detainees**

The Local Government agrees to accept federal detainees only upon presentation by a law enforcement officer of the Federal Government with proper agency credentials.

The Local Government shall not relocate a federal detainee from one facility under its control to another facility not described in this Agreement without permission of the Federal Government.

The Local Government agrees to release federal detainees only to law enforcement officers of the Federal Government agency initially committing the federal detainee (i.e., Drug Enforcement Administration, Bureau of Immigration and Customs Enforcement, etc.) or to a Deputy United States Marshal (DUSM). Those federal detainees who are remanded to custody by a DUSM may only be released to a DUSM or an agent specified by the DUSM of the Judicial District.

USMS federal detainees sought for a state or local court proceeding must be acquired through a Writ of Habeas Corpus or the Interstate Agreement on Detainers and then only with the concurrence of the district United States Marshal (USM).

**Optional Guard/Transportation Services to Medical Facility**

If Medical Services in block 13 on page (1) of this Agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide transportation and escort guard services for federal detainees housed at their facility to and from a medical facility for outpatient care, and transportation and stationary guard services for federal detainees admitted to a medical facility.

These services should be performed by (b) (7)(E) qualified law enforcement or correctional officer personnel. If the Local Government is unable to meet this requirement, the Local Government may seek a waiver of this requirement from the local U.S. Marshal.

The Local Government agrees to augment this security escort if requested by the USM to enhance specific requirement for security, prisoner monitoring, visitation, and contraband control.

If an hourly rate for these services has been agreed upon to reimburse the Local Government it will be stipulated on page (1) of this Agreement. Mileage shall be reimbursed in accordance with the current GSA mileage rate.

JUNE 2015 ICE2012FOIA03030.000022

## Optional Guard/Transportation Services to U.S. Courthouse

If U.S. Courthouse in block 13 on page (1) of this Agreement is checked, the Local Government agrees, subject to the availability of its personnel, to provide transportation and escort guard services for federal detainees housed at its facility to and from the U.S. Courthouse.

These services should be performed by (b) (7)(E)          qualified law enforcement or correctional officer personnel. If the Local Government is unable to meet this requirement, the Local Government may seek a waiver of this requirement from the local U.S. Marshal.

The Local Government agrees to augment this security escort if requested by the USM to enhance specific requirements for security, detainee monitoring, and contraband control.

Upon arrival at the courthouse, the Local Government's transportation and escort guard will turn federal detainees over to a DUSM only upon presentation by the deputy of proper law enforcement credentials.

The Local Government will not transport federal detainees to any U.S. Courthouse without a specific request from the USM who will provide the detainee's name, the U.S. Courthouse, and the date the detainee is to be transported.

Each detainee will be restrained in handcuffs, waist chains, and leg irons during transportation.

If an hourly rate for these services has been agreed upon to reimburse the Local Government it will be stipulated on page (1) of this Agreement. Mileage shall be reimbursed in accordance with the current GSA mileage rate.

### Special Notifications

The Local Government shall notify the Federal Government of any activity by a federal detainee which would likely result in litigation or alleged criminal activity.

The Local Government shall immediately notify the Federal Government of an escape of a federal detainee. The Local Government shall use all reasonable means to apprehend the escaped federal detainee and all reasonable costs in connection therewith shall be borne by the Local Government. The Federal Government shall have primary responsibility and authority to direct the pursuit and

Page 7 of 12

capture of such escaped federal detainees. Additionally, the Local Government shall notify the Federal Government as soon as possible when a federal detainee is involved in an attempted escape or conspiracy to escape from the facility.

In the event of the death or assault of a federal detainee, the Local Government shall immediately notify the Federal Government.

## Prisoner Rape Elimination Act (PREA)

The detention facility is requested to post the Prisoner Rape Elimination Act brochure/bulletin in each housing unit of the facility. All detainees have a right to be safe and free from sexual harassment and sexual assaults. (See Page 11)

## Service Contract Act

This Agreement incorporates the following clause by reference, with the same force and effect as if it was given in full text. Upon request, the full text will be made available. The full text of this provision may be accessed electronically at this address: www.arnet.gov.

Federal Acquisition Regulation Clause(s):

52.222-41 Service Contract Act of 1965, as Amended (July 2005)

52.222-42 Statement of Equivalent Rates for Federal Hires (May 1989)

52.222-43 Fair Labor Standards Act and the Service Contract Act – Price Adjustment (Multiyear and Option Contracts) (May 1989)

The current Local Government wage rates shall be the prevailing wages unless notified by the Federal Government.

## Per-Diem Rate

The Federal Government will use various price analysis techniques and procedures to ensure the per-diem rate established by this Agreement is considered a fair and reasonable price. Examples of such techniques include, but are not limited to, the following:

1. Comparison of the requested per-diem rate with the independent government estimate for detention services, otherwise known has the Core Rate;

2. Comparison with per-diem rates at other state or local facilities of similar size and economic conditions;

Page 8 of 12

3.  Comparison of previously proposed prices and previous Federal Government and commercial contract prices with current proposed prices for the same or similar items;

4.  Evaluation of the provided jail operating expense information;

The firm-fixed per-diem rate for services is $110.00, and shall not be subject to adjustment on the basis of Bergen County Jail actual cost experience in providing the service.  The per-diem rate shall be fixed for a period from the effective date of the Agreement forward for 36 months.  The per-diem rate covers the support of one federal detainee per "federal detainee day", which shall include the day of arrival, but not the day of departure.

After 36 months, if a rate adjustment is desired, the Local Government shall submit a request through the Electronic Intergovernmental Agreements area of the Detention Services Network (DSNetwork).  All information pertaining to the jail on DSNetwork will be required before a new per-diem rate can be considered.

## Billing and Financial Provisions

The Local Government shall prepare and submit for certification and payment, original and separate invoices each month to each Federal Government component responsible for federal detainees housed at the facility.

Addresses for the components are:

United States Marshals Service
District of New Jersey
500 U.S. Courthouse
P.O. Box 186
Newark, New Jersey 07101
(201) 645-2404


Immigration & Customs Enforcement
Regional Commissioner
70 Kimball Avenue
S. Burlington, Vermont 05403
(802) 660-1180


To constitute a proper monthly invoice, the name and address of the facility, the name of each federal detainee, their specific dates of confinement, the total days to be paid, the appropriate per diem rate

JUNE 2015 ICE2012FOIA03030.000025

Agreement Number 50-06-0023

as approved in the Agreement, and the total amount billed (total days multiplied by the rate per day) shall be listed, along with the name, title, complete address and telephone number of the Local Government official responsible for invoice preparation.
Nothing contained herein shall be construed to obligate the Federal Government to any expenditure or obligation of funds in excess of, or in advance of, appropriations in accordance with the Anti-Deficiency Act, 31 U.S.C. 1341.

## Payment Procedures

The Federal Government will make payments to the Local Government on a monthly basis, promptly after receipt of an appropriate invoice. The Local Government shall provide a remittance address below:

Bergen County Jail

160 South River Street Hackensack, NJ 07601

## Modifications and Disputes

Either party may initiate a request for modification to this Agreement in writing.  All modifications negotiated will be effective only upon written approval of both parties.

Disputes, questions, or concerns pertaining to this Agreement will be resolved between appropriate officials of each party.  Both the parties agree that they will use their best efforts to resolve the dispute in an informal fashion through consultation and communication, or other forms of non-binding alternative dispute resolution mutually acceptable to the parties.

## Inspection of Services

The Local Government agrees to allow periodic inspections of the facility by Federal Government inspectors.  Findings of the inspection will be shared with the facility administrator in order to promote improvements to facility operations, conditions of confinement, and levels of services.

## Litigation

Page 10 of 12

Agreement Number 50-06-0023

The Federal Government shall be notified, in writing, of all litigation pertaining to this Agreement and provided copies of any pleadings filed or said litigation within 5 working days of the filing.

The Local Government shall cooperate with the Federal Government legal staff and/or the United States Attorney regarding any requests pertaining to Federal Government or Local Government litigation.

**Page 11 of 12**

JUNE 2015 ICE2012FOIA03030.000027

# Prisoner Rape Elimination Act Reporting Information

## SEXUAL ASSAULT AWARENESS

This document is requested to be posted in each Housing Unit Bulletin Board at all Contract Detention Facilities. This document may be used and adapted by Intergovernmental Service Agreement Providers.

While detained by the Department of Justice, United States Marshals Service, you have a right to be safe and free from sexual harassment and sexual assaults.

## Definitions

### A. Detainee-on-Detainee Sexual Abuse/Assault

One or more detainees engaging in or attempting to engage in a sexual act with another detainee or the use of **threats, intimidation, inappropriate touching or other actions and/or communications by one or more detainees aimed at coercing and/or pressuring** another detainee to engage in a sexual act.

### B. Staff-on-Detainee Sexual Abuse/Assault

Staff member engaging in, or attempting to engage in a sexual act with any detainee or the intentional touching of a detainee's genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desires of any person. **Sexual abuse/assault of detainees by staff or other detainees is an inappropriate use of power and is prohibited by DOJ policy and the law.**

### C. Staff Sexual Misconduct is:

Sexual behavior between a staff member and detainee which can include, but is not limited to indecent, profane or abusive language or gestures and inappropriate visual surveillance of detainees.

## Prohibited Acts

A detainee, who engages in inappropriate sexual behavior with or directs it at others, can be charged with the following Prohibited Acts under the Detainee Disciplinary Policy.

- **Using Abusive or Obscene Language**
- **Sexual Assault**
- **Making a Sexual Proposal**
- **Indecent Exposure**
- **Engaging in Sex Act**

## Detention as a Safe Environment

While you are detained, no one has the right to pressure you to engage in sexual acts or engage in unwanted sexual behavior regardless of your age, size, race, or ethnicity. Regardless of your sexual orientation, you have the right to be safe from unwanted sexual advances and acts.

## Confidentiality

Information concerning the identity of a detainee victim reporting a sexual assault, and the facts of the report itself, shall be limited to those who have the need to know in order to make decisions concerning the detainee-victim's welfare and for law enforcement investigative purposes.

## Report All Assaults!

If you become a victim of a sexual assault, you should report it immediately to any staff person you trust, to include housing officers, chaplains, medical staff, supervisors or Deputy U.S.

Marshals. Staff members keep the reported information confidential and only discuss it with the appropriate officials on a need to know basis. If you are not comfortable reporting the assault to staff, you have other options:

- Write a letter reporting the sexual misconduct to the person in charge or the United States Marshal. To ensure confidentiality, use special (Legal) mail procedures.
- File an Emergency Detainee Grievance - If you decide your complaint is too sensitive to file with the Officer in Charge, you can file your Grievance directly with the Field Office Director. You can get the forms from your housing unit officer, or a facility supervisor.
- Write to the Office of Inspector General (OIG), which investigates allegations of staff misconduct. The address is: Office of Inspector General, U.S. Department of Justice, 950 Pennsylvania Ave. Room 4706, Washington, DC. 20530
- Call, **at no expense to you,** the Office of Inspector General (OIG). The phone number is 1-800-869-4499.

**Individuals who sexually abuse or assault detainees can only be disciplined or prosecuted if the abuse is reported.**

A publication of the Office of the Federal Detention Trustee Washington, DC

Published February 2008

JUNE 2015 ICE2012FOIA03030.000028