UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JESUS PRADO,

                Plaintiff,

         -v-

ICE AGENT PEREZ, *et al.*,

                Defendants.

18-CV-9806 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Plaintiff Jesus Prado brings this action under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.*, against Defendants Immigration and Customs Enforcement ("ICE") Agents Perez, Attanasio, Olivencia, and Calidonio, as well as the United States of America ("the Government"). Defendants have now moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. No. 28.) For the reasons that follow, Defendants' motion to dismiss is granted in part and denied in part.

**I.    Background**

      The following facts are drawn from the complaint and are assumed true for purposes of this motion.

      Plaintiff Jesus Prado is a 60-year old immigrant with a major neurocognitive disorder and "debilitating depression" who has lived with HIV since 1994. (*See* Compl. ¶ 14.) He has also suffered from prostate-related obstructive uropathy. (Compl. ¶ 44.) Since 2013, he has lived in a Community Access housing complex at Gouverneur Court, a supportive housing environment in Manhattan. (Compl. ¶ 15.) Gouverneur Court provides Prado with daily meals, regular in-home visits, and a 24-hour security desk. (Compl. ¶ 16.) At the time of his 2015 arrest, he was

1

receiving outpatient psychiatric treatment through the Mental Health Court in New York by agreement of the New York County District Attorney, a program that covers individuals who have been diagnosed with a serious mental illness. (Compl. ¶ 19.)

On October 27, 2015, at 5:00 a.m., Prado was awakened in his home at Gouverneur Court by ICE agents Perez, Attanasio, Olivencia, and Calidonio demanding entry. (Compl. ¶¶ 20, 25.) As soon as he opened the door, Prado was pushed back inside the room and ordered to move to the bed. (Compl. ¶ 25.) The ICE agents identified themselves as "immigration" and had only an administrative immigration warrant. (Compl. ¶¶ 21, 25.)

The ICE agents did not request, nor did Prado give, voluntary consent to enter. (Compl. ¶ 26.) Three of the agents entered the apartment, while one stood at the doorway with his hand on his gun. (Compl. ¶ 27.) One agent "grabbed . . . Prado by his shirt and pushed him onto the bed, where [Prado] began to cry." (*Id.*) Prado asked what was happening and informed the agents that he had done nothing wrong. (*Id.*) The agent who had pushed Prado demanded his identification and "papers." (*Id.*) Prado informed the agent that he had papers showing that he was Permanently Residing Under Color of Law ("PRUCOL"). (*Id.*) The agents searched through Prado's drawers, cabinets, and closet. (Compl. ¶ 28.) Prado, confined to his bed, protested that the agents needed a warrant to search his home, to which they responded that it was their job. (*Id.*) Prado was then told to get dressed and was informed that he was being taken into ICE custody. (Compl. ¶ 29.) He informed the agents that he was sick, had HIV, and that he needed to bring his medications along with him. (*Id.*) Without inquiring further into his condition, the agents picked up his bag of medications, handcuffed him, and took him to their car. (*Id.*) Prado alleges that he experienced "psychological trauma and physical discomfort as a result of [their] intrusion." (Compl. ¶ 30.)

Prado was then processed and moved to the Varick Street Federal Building in Manhattan, where he received a Notice to Appear in Removal Proceedings and an initial medical screening. (Compl. ¶ 31.) At some point during this initial processing, Prado's medication bag was taken from him and thrown in the trash. (Compl. ¶ 37.) An ICE employee told him that he would receive medication when he got to New Jersey. (*Id.*) Later that morning, he was transported to the Bergen County Jail ("Bergen") in Hackensack, New Jersey. (Compl. ¶ 31.) Prado was detained at Bergen from October 27, 2015, to April 19, 2016. (Compl. ¶ 32.) Once at Bergen, he did not receive any medication for the first five days of his detention. (Compl. ¶ 38.) After his initial medical appointment with staff, they began to administer the wrong medications. (*Id.*) When his physician contacted ICE, eight days into his detention, Bergen began to administer the correct medications. (*Id.*) Even after the correct medication was prescribed, it was improperly administered to him. (Compl. ¶¶ 41–42.) The improper administration of his medications caused daily vomiting and diarrhea. (Compl. ¶ 42.) Prado's counsel continually requested that ICE ensure that his medication was properly administered, but Bergen continued to improperly administer his medication for three months. (Compl. ¶ 43.)

Prado's prostate-related obstructive uropathy soon worsened, causing him serious pain. (Compl. ¶ 44.) In January 2016, a urologist informed Prado that his condition was no longer treatable with medication and he needed a surgical procedure. (Compl. ¶ 46.) Prado's counsel continued to contact ICE to seek assistance with Prado's medical situation, including a request for him to be returned to Gouverneur Court, where he would receive better care. (Compl. ¶ 48.) After an unexplained two-month delay, Prado was able to get the procedure, and his release request was denied. (Compl. ¶¶ 47, 51.) On April 19, 2016, an immigration judge ordered him released on his own recognizance, and allowed him to return home. (Compl. ¶ 54.)

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(1) requires courts to dismiss a case for lack of subject-matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it." *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (per curiam) (quoting *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009) (per curiam)). When resolving a motion to dismiss pursuant to Rule 12(b)(1), district courts "may refer to evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

Federal Rule of Civil Procedure 12(b)(6) requires courts to dismiss a case for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the complaint's factual allegations as true and draw all inferences in the plaintiff's favor. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) (citation omitted). However, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. Discussion

### A. Subject-Matter Jurisdiction Under 8 U.S.C. § 1252(g)

Defendants argue that this Court lacks subject-matter jurisdiction over the bulk of Prado's claims because a district court may not hear any claim by an alien "arising from" the commencement of removal proceedings under 8 U.S.C. § 1252(g). (Dkt. No. 29 at 5–7.) This includes, Defendants argue, any claims arising from unlawful arrest or detention.

Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to

4

commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g). The Supreme Court has held that this provision has not been "interpret[ed] . . . to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General. Instead, . . . the language . . . refer[s] to just those three specific actions themselves." *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482–83 (1999)). Accordingly, courts in this district have found that there is no deprivation of jurisdiction to hear claims arising from unlawful arrest or detention, because those claims are too distinct to be said to "arise from" the commencement of removal proceedings. *See, e.g.*, *You, Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 457 (S.D.N.Y. 2018) (holding that unlawful arrest and detention claims fell "outside the ambit of § 1252(g)" because "[t]he question before the Court is not why the Secretary chose to execute the removal order . . . [it] is whether the way Respondents acted accords with the Constitution and the laws of this country"); *Michalski v. Decker*, 279 F. Supp. 3d 487, 495 (S.D.N.Y. 2018) (rejecting the argument that unlawful arrest and detention claims are part and parcel of the commencement of removal proceedings because "the decision or action to detain an individual . . . is independent from the decision or action to commence a removal proceeding").

For the same reasons, this Court concludes that it retains jurisdiction over Prado's claims.

### B. Scope of the FTCA

Defendants argue that the FTCA does not permit Prado's claim for negligently provided medical care because the United States has not waived its sovereign immunity for obligations that it has delegated to independent contractors. (Dkt. No. 29 at 8–13.) Because "the doctrine of sovereign immunity is jurisdictional in nature," *Makarova*, 201 F.3d at 113, Defendants argue that this Court lacks subject-matter jurisdiction over this claim.

The FTCA "constitutes a limited waiver by the United States of its sovereign immunity and allows for a tort suit against the United States under specific circumstances." *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007) (internal quotation marks and citation omitted). The FTCA allows, and thus the United States has waived its sovereign immunity with respect to, claims involving:

> injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant.

28 U.S.C. § 1346(b)(1). Under the FTCA, the term "employee" "specifically excludes 'any contractor with the United States.'" *Roditis v. United States*, 122 F.3d 108, 111 (2d Cir. 1997) (per curiam) (quoting 28 U.S.C. § 2671). Defendants argue that because responsibility for detainees' medical care was delegated to Bergen under an Inter-Governmental Service Agreement ("IGSA"), the United States is not liable for negligent provision of any such medical care. (*See* Dkt. No. 29 at 8–13.)

However, Prado is only seeking to hold Defendants directly liable for their own alleged negligence, rather than vicariously liable for any negligence on the part of Bergen, which was indisputably an independent contractor. (*See* Dkt. No. 34 at 13.) As a result, the relevant issue here "is whether the duty to provide [medical] care was delegated *in its entirety*." *Harvey v. United States*, No. 14 Civ. 1787, 2017 WL 2954399, at *4 (S.D.N.Y. July 10, 2017) (citing *Edison v. United States*, 822 F.3d 510, 518 (9th Cir. 2016)).

Under the IGSA, Bergen was responsible for "provid[ing] federal detainees with the full range of medical care inside the detention facility." (Compl. at 24.) However, "[a]ll outside medical care provided to federal detainees" required "pre-approv[al] by the Federal Government." (*Id.*) In the complaint, Prado alleges that his counsel repeatedly informed ICE

6

both that his medication was not being administered correctly and that he required a surgical procedure.  (*See* Compl. ¶¶ 37–54.)  Specifically, Prado alleges that the Government "breached its duty to provide continuity of care" when ICE "fail[ed] to ensure that [he] would receive his prescribed medications upon arrival at Bergen."  (Compl. ¶ 40.)  He further alleges that the Government breached its duty to "ensure that immigration detainees received necessary external treatment in a timely manner" when his surgery was delayed for almost two months.  (Compl. ¶ 52.)

The Government is not immune from suit for either of these claims.  First, the Government is not immune from Prado's negligence claims regarding the misadministration of his medication.  Prado has alleged that ICE was responsible for ensuring that its facilities comply with the ICE National Detention Standards ("NDS").  (Compl. ¶ 33.)  As part of the NDS, when a detainee is transferred to another facility after receiving an initial screening, the sending facility must send a medical summary that includes prescription information and a 7-day supply of medication.  (Compl. ¶ 36.)  Further, all medical records must travel with the detainee pursuant to the NDS.  (*Id.*)  Prado alleges that ICE failed to follow that mandate, as ICE took his prescription medications from him and threw them in the trash, and he did not receive any medications for the first five days he was in custody at Bergen.  (Compl. ¶¶ 36–38.)  If it is the case that ICE did not provide Bergen with the requisite health information, and acted negligently in failing to do so, its negligence would fall within the scope of the FTCA.  And further, because Prado was not yet in Bergen's "care and custody" when ICE allegedly failed to ensure that Prado's health information made it to Bergen, it is unclear whether the IGSA even applies, much less limits the Government's liability.  *See Charles v. United States*, No. 18 Civ. 883, 2019 WL 1409280, at *3 (S.D.N.Y. Mar. 28, 2019).  Accordingly, this Court declines to dismiss Prado's

negligence claims based on the incorrect administration of his medication for lack of subject-matter jurisdiction.[1]

Second, the Government is not immune from Prado's negligence claims regarding his delayed surgery. The Government explicitly retained pre-approval power under the IGSA with respect to any outside medical care that detainees needed. (Compl. at 24.) As discussed above, this Court is deprived of subject-matter jurisdiction over this claim only if "the duty to provide [medical] care was delegated *in its entirety*." *Harvey*, 2017 WL 2954399, at *4 (citing *Edison*, 822 F.3d at 518). By retaining pre-approval authority, the Government failed to delegate its entire duty of care to Bergen. Prado alleges that ICE was repeatedly put on notice that he needed surgery. (*See* Compl. ¶ 48.) And it was only after an unexplained two-month delay that Prado was able to get the surgery he needed. (Compl. ¶ 47.) In essence, Prado alleges that the Government's delay in approving Prado's surgery was negligent. (*See* Compl. ¶ 53.) And while Defendants argue that the IGSA contemplates that Bergen, not Prado, would request the surgery (*see* Dkt. No. 39 at 9), that is irrelevant. Ultimately, the Government retained the authority to approve or reject requests for outside medical treatment. To the extent that the Government acted negligently in wielding that authority, sovereign immunity will not save it from liability because approval authority was not part of the duty of care that was delegated to Bergen. *See Charles*, 2019 WL 1409280, at *3. Accordingly, this Court declines to dismiss Prado's

---

[1] Defendants also argue that Prado's claim of negligent medical care should be dismissed pursuant to Rule 12(b)(6). (Dkt. No. 29 at 13–16.) For similar reasons, their argument is rejected. While Defendants dispute that there was any duty to provide medical information to Bergen, and it was reasonable for them to assume that Bergen had HIV/AIDS medication on hand (*see id.*), a reasonable factfinder could determine that ICE had a duty to transfer at least some medical information to Bergen. Because on a Rule 12(b)(6) motion the Court must draw all inferences in the plaintiff's favor, *see Cleveland*, 448 F.3d at 521, Prado's negligent medical treatment claims survive.

negligence claims based on any delayed approval for his surgery for lack of subject-matter jurisdiction.

      **C.**    ***Bivens* Claim**

Defendants argue that Prado may not recover under the implied civil right of action recognized in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) because "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." (Dkt. No. 29 at 23 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017).) To determine whether a *Bivens* remedy is available in a given case, the Court must engage in a two-step inquiry. First, the Court must determine whether the "case presents a new *Bivens* context." *Abbasi*, 137 S. Ct. at 1859. If the context is indeed new, then the Court must discern whether there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Id.* at 1857 (quoting *Carlson v. Green*, 446 U.S. 14, 18 (1980)).

First, "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Id.* at 1859. The Supreme Court has detailed several differences that could make a context "new":

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860. This Court finds that Prado's claim does not differ in a meaningful way from the core *Bivens* context, and thus does not present a "new context." Although "the new-context inquiry is easily satisfied . . . [s]ome differences, of course, will be so trivial that they will not suffice to create a new *Bivens* context." *Id.* at 1865. "*Bivens* concerned an allegedly unconstitutional arrest and search carried out in New York City." *Hernandez v. Mesa*, 140 S. Ct.

9

735, 744 (2020). Here too, Prado sues for an allegedly unconstitutional arrest and search — one that was even carried out in New York City. (*See* Compl. ¶¶ 58–61.) Because Prado's claims assert the same constitutional right that formed the basis of *Bivens*, that fact "weighs heavily in favor of finding that [Prado's] claims arise in the *Bivens* context, rather than in a 'new' context." *Lehal v. Cent. Falls Det. Facility Corp.*, No. 13 Civ. 3923, 2019 WL 1447261, at *11 (S.D.N.Y. Mar. 15, 2019); *see also Abbasi*, 137 S. Ct. at 1856 (noting that the "opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose").

Defendants argue that because the ICE agents were operating under a different legal and statutory mandate than were the federal agents in *Bivens*, this case presents a new context. This Court disagrees. First, Defendants argue that unlike in *Bivens*, the ICE agents here had an administrative warrant to arrest Prado, rather than no warrant at all. This argument is unavailing. Prado has alleged that the administrative immigration warrant that the ICE agents possessed did not permit entry into or the search of his home. (Compl. ¶¶ 20–21.) Thus, like the federal agents in *Bivens*, the ICE agents here were not legally privileged to enter or search Prado's home. Therefore, based on the allegations, there was no "legal mandate" whatsoever under which a new context could be created for *Bivens* purposes.

Second, Defendants argue that ICE agents are unlike FBI agents because ICE enforces the Immigration and Naturalization Act ("INA"), rather than the criminal law. That argument takes too limited a view of the scope of *Bivens*. Every federal law enforcement agency exists under different statutory authority and is responsible for the enforcement of some subsection of federal law. Despite that fact, *Bivens* actions have been sustained against federal law enforcement officers beyond FBI agents, including ICE agents. *See Argueta v. U.S. Immigration*

10

*& Customs Enf't*, No. 08 Civ. 1652, 2009 WL 1307236, at *17–19 (D.N.J. May 7, 2009); *see also Chavez v. United States*, 683 F.3d 1102 (9th Cir. 2012) (holding that a *Bivens* action could be sustained against Border Patrol agents); *Lehal*, 2019 WL 1447261 (holding that a *Bivens* action could be sustained against U.S. Marshals); *Van Eck v. Cimahosky*, 329 F. Supp. 2d 265, 270–71 (D. Conn. 2004) (holding that a *Bivens* action could be sustained against Department of Transportation officers). It cannot be that the character of the law enforcement officer, without more, automatically converts a plaintiff's claim into a "new context," even post-*Abbasi*. Because this case is an allegedly unconstitutional search and seizure carried out by federal law enforcement, Prado's claims do not present a new context for the purposes of his *Bivens* claim.

Even assuming, *arguendo*, that this case presents a new *Bivens* context, there are no "special factors counseling hesitation in the absence of affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1857 (citation omitted). If "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy . . . the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Id.* at 1858.

Defendants argue that the INA's comprehensive enforcement scheme precludes a *Bivens* remedy here. (Dkt. No. 29 at 28–31.) Again, the Court disagrees. The Ninth Circuit has recently held that the mere fact that the INA lacks an internal damages remedy does not counsel hesitation when finding an implied *Bivens* remedy against an ICE employee. *See Lanuza v. Love*, 899 F.3d 1019, 1030–31 (9th Cir. 2018). Critically, "although the INA contains a comprehensive scheme governing the appeal of removal proceedings and the Attorney General's discretionary decisions, it does *not* provide a remedial scheme for violations committed by immigration officials outside of removal proceedings." *Diaz-Bernal v. Myers*, 758 F. Supp. 2d

11

106, 128 (D. Conn. 2010); *see also id.* at 129 (finding that there were no "special factors" counseling against a *Bivens* remedy because "the plaintiffs . . . do not question their removal, but instead allege independent constitutional harms that were committed against them prior to the commencement of removal proceedings").

Rights without remedies are cold comfort. In *Abbasi*, the Supreme Court acknowledged that "individual instances of . . . law enforcement overreach" are by "their very nature . . . difficult to address *except* by way of damages after the fact." 137 S. Ct. at 1862 (emphasis added). There are no material differences between the work of immigration enforcement and the work of criminal law enforcement that would counsel against the implication of a *Bivens* remedy here. This is especially true in this case, one that differs from the core *Bivens* context only in that the federal agent defendants were employed by ICE rather than by the FBI. As a result, failure to provide plaintiffs a *Bivens* remedy in this case would hold ICE to a lower standard of conduct than the FBI must adhere to in an identical set of circumstances without any compelling reason to do so. Accordingly, this Court determines that Prado has adequately stated a claim under *Bivens*.

### D. Trespass Claim

Defendants argue that this Court lacks subject-matter jurisdiction over Prado's trespass claim under 28 U.S.C. § 2675. Under 28 U.S.C. § 2675(a), "[a]n action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government . . . unless the claimant shall have first presented the claim to the appropriate Federal agency." Further, under 28 U.S.C § 2675(b), an "[a]ction . . . shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovery evidence . . . ." Exhaustion pursuant to these

provisions is a nonwaivable jurisdictional requirement. *See, e.g.*, *Celestine v. Mount Vernon Neighborhood Health Ctr.,* 403 F.3d 76, 82 (2d Cir. 2005).

Prado submitted a claim to ICE related to his arrest and detention that claimed damages for only personal injury but none for any property damage. (Dkt. No. 30-4 at 2.) However, Defendants argue that because Prado cannot obtain personal injury damages under a trespass theory, and because the Government was not put on notice regarding any potential property damages, Prado's trespass claims must be dismissed. (Dkt. No. 29 at 25–26.)

"Under New York law, trespass is the intentional invasion of another's property." *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996). "[D]amages for trespass are limited to consequences flowing from the interference with possession and not for *separable* acts more properly allocated under other categories of liability." *Costlow v. Cusimano*, 311 N.Y.S.2d 92, 97 (App. Div. 4th Dep't 1970) (emphasis added). While Defendants argue that this rule means that there can be no damages for trespass other than property damage (*see* Dkt. No. 29 at 25–26), this is a misstatement of the law. While the typical trespass claim involves damages that flow from harm to real property, there is no requirement in New York law that trespass damages are *limited* to property-based harm.[2] Prado alleges that his personal injury flows directly from ICE's allegedly unlawful intrusion into his home, not from any *separable* acts other than the intrusion. (Dkt. No. 34 at 18.) Because Prado alleges that his personal injury was a consequence of the trespass, there is no prohibition on Prado's suit.

---

[2] Defendants cite *Biondo v. Linden Hill United Methodist Cemetery Corp.*, 720 N.Y.S.2d 558 (App. Div. 2d Dep't 2001) for the proposition that trespass cannot be used to obtain damages that are better recognized under another category of liability. However, *Biondo* did not involve a trespass claim at all. It affirmed the dismissal of the plaintiff's negligent and intentional infliction of emotional distress claims on the basis of the proposition that damages cannot be recovered for emotional distress flowing from an intentional or negligent harm only to personal property. *Biondo*, 720 N.Y.S.2d at 558. As such, *Biondo* is irrelevant to the trespass claim here.

13

Because those allowable personal injuries were properly reported to the Government (*see* Dkt. No. 30-4 at 2), Prado's trespass claim survives.

### E. Abuse of Process

Under New York law, to state a claim for abuse of process, a plaintiff must allege that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act; (2) with intent to do harm without excuse or justification; and (3) in order to obtain a collateral objective that is outside legitimate ends of process." *Williams v. Young*, 769 F. Supp. 2d 594, 603 (S.D.N.Y. 2011) (quoting *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)).

Here, Prado has failed to allege that there was a collateral objective that Defendants sought to obtain. To state a claim for abuse of process, a plaintiff "must claim that [a defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77. "[C]ollateral objectives typically associated with abuse of criminal process are extortion, blackmail, or retribution; and those objectives are usually characterized by personal animus." *Corso v. City of New York*, No. 17 Civ. 6096, 2018 WL 4538899, at *10 (S.D.N.Y. Sept. 20, 2018) (alteration in original) (citation omitted).

Here, Prado argues that the collateral objective was to exceed the scope of the warrant and gain entry into Prado's home. (Dkt. No. 34 at 22.) However, this is insufficient to sustain an abuse of process claim. Prado's claims are more properly understood as an allegedly improper *means* by which the arrest was effectuated, rather than the improper *purpose* he must allege to state an abuse of process claim. Because Prado has not alleged the requisite collateral objective to sustain an abuse of process claim, that claim is dismissed.

F.  **Negligent Infliction of Emotional Distress**

In New York, "[a] breach of the duty of care resulting directly in emotional harm is compensable even though no physical injury occurred when the mental injury is a direct, rather than a consequential, result of the breach and when the claim possesses some guarantee of genuineness." *Taggart v. Costabile*, 14 N.Y.S.3d 388, 396 (App. Div. 2d Dep't 2015) (quoting *Ornstein v. N.Y.C. Health & Hosps. Corp.*, 881 N.E.2d 1187, 1189 (N.Y. 2008)). The "guarantee of genuineness" requirement is demonstrated "by showing that a breach of a duty owed to the injured party endangered that party's physical safety or caused them to fear for their physical safety." *Sesto v. Slaine*, 171 F. Supp. 3d 194, 204 (S.D.N.Y. 2016).

Defendants argue that Prado has not identified a duty of care that the ICE agents owed to him. (*See* Dkt. No. 29 at 22–23.) For the purposes of a negligent infliction of emotional distress claim, "[t]he duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). As a result, Defendants argue that "law enforcement officers cannot be tasked with knowing the mental condition of every person they arrest and whether arresting them would subject them to emotional harm." (Dkt. No. 29 at 22.) However, in this particular case the ICE agents were on notice that Prado's mental state was particularly susceptible to harm. Not only was Prado living in a supportive housing facility for vulnerable individuals, including those with psychiatric disabilities, but his law enforcement records reflected that he suffered from a serious mental illness. (Compl. ¶¶ 15–16, 19.) While Defendants protest that they should not be charged with this knowledge because "it is in relation to a separate state proceeding" (Dkt. No. 29 at 23 n.5), presumably ICE investigated Prado to some degree before securing an administrative warrant for his arrest, and his law enforcement records were available at ICE's request. For the purposes of

a motion to dismiss, Prado has adequately alleged that ICE had a duty specific to Prado because he was particularly vulnerable to emotional distress given his history of mental illness.

Further, Prado has adequately alleged the requisite "guarantee of genuineness" by demonstrating that the ICE agents' conduct caused him to fear for his physical safety. The circumstances here go far beyond that of a routine arrest. Prado was roused out of bed before dawn by the agents' shouting. (Compl. ¶¶ 20, 25.) When he opened the door, they pushed him back into the room, grabbed him by the shirt, and pushed him onto the bed where he began to cry. (Compl. ¶¶ 25, 27.) An agent stood by in the doorway with his hand on his gun. (Compl. ¶ 27.) The agents then proceeded to search his apartment while he protested. (Compl. ¶ 28.) As alleged, it is certainly plausible that these series of events caused Prado to fear for his physical safety. This is particularly true because Prado is a vulnerable plaintiff.

And while it is true that "New York does not recognize [negligent infliction of emotional distress] causes of action where the conduct underlying them may be addressed through traditional tort remedies," *Berrio v. City of New York*, No. 15 Civ. 9570, 2017 WL 118024, at *7 (citations omitted), that concept is inapplicable here. There is no other tort remedy that fully encompasses the emotional harm that flows from the disregard for a plaintiff's particular vulnerability — indeed, that is the essence of negligent infliction of emotional distress. Accordingly, Prado's negligent infliction of distress claims survive Defendants' motion to dismiss.

IV.     **Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Clerk of Court is directed to close the motion at Docket Number 28.

Defendants are directed to file an answer to the remaining claims on or before April 24, 2020.

SO ORDERED.

Dated: April 3, 2020
New York, New York

_____
J. PAUL OETKEN
United States District Judge